IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Betty Ann Schumpert, | ) | C/A No.: 1:19-2944-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of Honorable Timothy M. Cain, United States District Judge, dated July 13, 2020, referring this matter for disposition. [ECF No. 19]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 16].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied

the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On June 17, 2015 Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on May 16, 2014. Tr. at 174, 259–64. Her applications were denied initially and upon reconsideration. Tr. at 180–84, 187–90, 191–94. On May 11, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Colin Fritz. Tr. at 40–96 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 24, 2018, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 16–39. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 16, 2019. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 57 years old at the time of the hearing. Tr. at 44. She completed high school. *Id.* Her past relevant work ("PRW") was as a data

entry clerk, a warehouse worker, a companion, and a receiving clerk. Tr. at 83–84. She alleges she has been unable to work since May 16, 2014. Tr. at 44.

2.    Medical History

Plaintiff was transported to Lexington Medical Center by ambulance on May 16, 2014, after hitting a tree that had fallen suddenly into the roadway. Tr. at 439. She complained of low back pain. *Id.* Elizabeth A. Renwick, M.D. ("Dr. Renwick"), observed tenderness, but normal musculoskeletal range of motion ("ROM") without edema. Tr. at 440. She noted a small abrasion to the left forearm and mild tenderness to palpation of the lumbar spine. *Id.* X-rays of the lumbar spine showed mild compression of the superior endplate of L1 of uncertain age, as well as degenerative disc disease ("DDD") and spondylosis at L5–S1. Tr. at 442–43. Dr. Renwick assessed back pain and an infected wrist abrasion. Tr. at 441.

On May 23, 2014, Plaintiff reported pain in her low back and between her shoulders. Tr. at 427. Roger Brown, M.D. ("Dr. Brown"), prescribed one-to-two Norco 5/325 mg tablets three times a day. *Id.*

On June 15, 2014, Plaintiff complained of a one-month history of constant, acute pain in her lumbar spine. Tr. at 418. She described the pain as radiating from her left lower back to her hip and associated with tingling in her left lateral thigh. *Id.* Mark Tyler, M.D. ("Dr. Tyler"), observed lumbar paraspinous tenderness and tenderness in the lumbosacral interspinous

region. Tr. at 419. He noted normal strength, motor skills, sensory exam, reflexes, gait, stance, posture, ROM, and psychiatric exam. *Id.* X-rays of Plaintiff's hips were normal. *Id.* X-rays of her lumbar spine showed DDD. *Id.* Dr. Tyler prescribed Tramadol 50 mg, Robaxin 750 mg, and Naproxen 500 mg; encouraged Plaintiff to rest and apply ice or heat; and specified that she should not engage in heavy lifting, carrying, pushing, or pulling. Tr. at 419–20.

On June 24, 2014, Plaintiff sought prescription refills for low back pain, generalized anxiety disorder ("GAD"), and weight loss. Tr. at 426. Dr. Brown refilled Naproxen 500 mg, Valium 10 mg, Adipex-P 37.5 mg, and Norco 5/325 mg. *Id.*

On August 19, 2014, Plaintiff complained of numbness on the left side of her hip that radiated toward her left abdominal area and down her left upper leg. Tr. at 425. She requested she be referred for magnetic resonance imaging ("MRI"). *Id.* Dr. Brown noted Plaintiff was experiencing radicular pain from her left lumbar region into her left hip in an L2 pattern that had begun when she was injured in a motor vehicle accident three months prior. *Id.* He refilled Plaintiff's medications. *Id.*

On October 15, 2014, Plaintiff complained of having pulled a muscle under the right side of her breast while exercising. Tr. at 461. She stated the

pain radiated into her back and increased when she coughed. *Id.* Dr. Brown refilled Plaintiff's medications. *Id.*

Plaintiff complained of continuous back pain and sought medication refills on November 20, 2014. Tr. at 460. Dr. Brown noted Plaintiff had pain in the lumbosacral region and in the left inguinal area consistent with nerve compression. *Id.* He refilled Plaintiff's medications. *Id.*

On November 21, 2014, state agency consultant Craig Horn, Ph.D. ("Dr. Horn"), reviewed the record and considered Listing 12.06 for anxiety-related disorders pursuant to a psychiatric review technique ("PRT"). Tr. at 100–01. He assessed a mild degree of limitation as to difficulties in maintaining concentration, persistence, or pace and no restriction of activities of daily ("ADLs"), difficulties in maintaining social functioning, or repeated episodes of decompensation. Tr. at 101. He concluded Plaintiff's anxiety disorder was non-severe. Tr. at 100–01.

State agency medical consultant Frank Ferrell, M.D. ("Dr. Ferrell"), reviewed the evidence and rated Plaintiff's physical impairments as non-severe on December 3, 2014. Tr. at 107.

Plaintiff presented to Dr. Brown with symptoms of an upper respiratory infection and requested medication refills on December 23, 2014. Tr. at 459. Dr. Brown refilled Plaintiff's medications and prescribed an

antibiotic. *Id.* Plaintiff followed up with Dr. Brown for prescription refills on February 10, 2015. Tr. at 458.

On March 10, 2015, Plaintiff requested prescription refills and a referral for an MRI of her back. Tr. at 457. Dr. Brown refilled Plaintiff's medications and ordered an MRI of the lumbar spine. *Id.*

On March 30, 2015, an MRI of Plaintiff's lumbar spine showed a compression fracture of L1 with greater than 50% loss of vertebral height and posterior displacement causing central canal and bilateral neuroforaminal stenosis. Tr.at 457. Dr. Brown indicated Plaintiff needed an orthopedic spine consultation. *Id.*

Plaintiff presented for medication refills and a referral on April 7, 2015. Tr. at 456. She complained of headache, coughing, green mucus, and sinus and ear pressure. *Id.* Dr. Brown refilled Plaintiff's medications and prescribed an antibiotic for bronchitis. *Id.* He referred Plaintiff to an orthopedist for evaluation of her back. *Id.*

Plaintiff presented to orthopedic surgeon James A. Loging, M.D. ("Dr. Loging"), on April 27, 2015. Tr. at 471. She reported having developed progressive and persistent pain in her back and radiating pain to her left hip and leg following a car accident in May 2014. *Id.* Dr. Loging observed some tenderness in the left side of Plaintiff's lower back, significant tenderness over the left sacroiliac joint, and positive straight-leg raise ("SLR") on the left.

6

*Id.* He reviewed Plaintiff's x-rays and explained that they showed "prior fairly collapsed compression fracture of L1, degenerative changes down at L4–5 at 5–1." *Id.* He considered it most likely that Plaintiff's back and leg pain was coming from the L1–2 area from the prior fracture. *Id.* He recommended epidural steroid injections ("ESIs"). *Id.* He stated Plaintiff "would not be capable of any strenuous activities, no lifting over 20 lb," but "could do office work at this point." *Id.*

Plaintiff presented to Dr. Loging for an ESI on April 29, 2015. Tr. at 470. Dr. Loging noted tenderness in the back and left leg. *Id.* He administered an ESI at L1–2 and facet injections at L1–2 and L2–3. *Id.*

On May 6, 2015, Plaintiff complained of headaches, sinus pressure, and fluid in her right ear and sought medication refills. Tr. at 455. Dr. Brown refilled Plaintiff's medications and prescribed Cefzil 500 mg and Flonase. *Id.*

Plaintiff presented to Dr. Brown for prescription refills on June 4, 2015. Tr. at 454. Dr. Brown noted Plaintiff's impairments included L1 compression fracture, arthritis at L4–5 and L5–S1, cervicalgia, GAD, hypertension, myalgia, and obesity. *Id.* He refilled Plaintiff's medications. *Id.*

On June 8, 2015, Plaintiff reported having received three to four weeks of pain relief following the last injection. Tr. at 469. Dr. Loging noted tenderness in the back and legs on physical exam, and Plaintiff complained of

pain in her neck. *Id.* Dr. Loging indicated he would schedule Plaintiff for an ESI at L1–2 and suggested she obtain an MRI of her neck. *Id.*

On June 10, 2015, Dr. Loging observed tenderness in Plaintiff's back and legs. Tr. at 468. He administered an ESI at L1–2 and facet injections at L1–2 and L2–3. *Id.*

Plaintiff requested medications for weight loss, anxiety, and back pain be refilled on July 2, 2015. Tr. at 453. She complained of headaches and requested a change in her blood pressure medication. *Id.* Dr. Brown discontinued Lisinopril-Hydrochlorothiazide 10/12.5 mg and prescribed Dyazide 37.5/25 mg. *Id.*

On July 20, 2015, Plaintiff reported her last ESI did not work quite as well. Tr. at 467. She continued to endorse some pain, but said she was doing better overall. *Id.* Dr. Loging noted less tenderness on physical exam. *Id.* He indicated he would try another ESI at L1–2. *Id.*

Plaintiff followed up with Dr. Brown for medication refills on July 30, 2015. Tr. at 522. She continued to endorse cervical pain. *Id.* Dr. Brown refilled Plaintiff's medications. *Id.*

Plaintiff returned to Dr. Loging for another ESI on August 5, 2015. Tr. at 477. Dr. Loging noted tenderness in Plaintiff's back and leg. *Id.* He administered an ESI at L1–2 and facet injections at L1–2 and L2–3. *Id.*

Plaintiff followed up with Dr. Brown for medication refills on August 26, 2015. Tr. at 490. She reported she had received a third injection that had worked well. *Id.*

On September 11, 2015, state agency medical consultant Carl Anderson, M.D. ("Dr. Anderson"), reviewed the evidence and provided the following physical residual functional capacity ("RFC") assessment: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, kneel, crouch, and climb ramps and stairs; occasionally stoop, crawl, and climb ladders, ropes, and scaffolds; and avoid concentrated exposure to hazards. Tr. at 121–23. Another state agency medical consultant, Adrian Corlette, M.D. ("Dr. Corlette"), reached the same conclusion on May 24, 2016. Tr. at 151–53.

On September 14, 2015, Plaintiff reported the last ESI had helped and she was generally doing better, but continued to have a lot of trouble with her neck. Tr. at 498. Dr. Loging scheduled Plaintiff for a repeat ESI and instructed her to follow up after obtaining an MRI of her neck. *Id.*

On September 16, 2015, state agency consultant Xanthia Harkness, Ph.D. ("Dr. Harkness"), reviewed the record and considered Listing 12.06 pursuant to a PRT. Tr. at 119–20. She concluded Plaintiff's anxiety disorder

was non-severe, as it produced no restriction of ADLs, difficulties in maintaining social functioning, repeated episodes of decompensation, or difficulties in maintaining concentration, persistence, or pace. *Id.* Debra C. Price, Ph.D. ("Dr. Price"), reviewed the record and reached the same conclusion on May 23, 2016. *Compare* Tr. at 119–20, *with* Tr. at 149–50.

On September 24, 2015, Plaintiff reported constant aching neck pain that traveled to the base of her head. Tr. at 489. She also complained of left wrist redness and bumps and itching on her left arm. *Id.* She indicated injections for her back pain had helped and she no longer had left hip and thigh radicular symptoms. *Id.* Dr. Brown discontinued Adipex, as Plaintiff reported no weight loss. *Id.* He refilled Plaintiff's other medications. *Id.*

On October 22, 2015, Dr. Loging administered an ESI and facet injections at L1–2. Tr. at 497.

Dr. Brown refilled Plaintiff's medications and prescribed antibiotics for a right ear infection on October 27, 2015. Tr. at 488.

Plaintiff complained of not feeling well on November 23, 2015. Tr. at 487. Dr. Brown diagnosed bronchitis, otalgia, candida vaginitis, hypertension, lumbago, seasonal allergies, and thoracic spine myalgia and prescribed medications. *Id.*

On January 4, 2016, Plaintiff complained of bilateral wrist pain that was worse on the right than the left. Tr. at 486. She indicated her back pain

was stable, but described constant, throbbing pain. *Id.* Dr. Brown refilled her medications. *Id.*

Plaintiff returned for another ESI on January 20, 2016. Tr. at 496. She indicated the ESI she received in October had been effective, but had started to wear off. *Id.* Dr. Loging administered an ESI at L1–2. *Id.*

On February 2, 2016, Plaintiff reported having received only 11 days of relief from her most recent ESI. Tr. at 485. She reported her pain had improved and that Vyvanse worked well. *Id.* Dr. Brown noted cervical pain on ROM testing, but no evidence of upper extremity radiculopathy. *Id.* He refilled Plaintiff's medications. *Id.*

Plaintiff underwent electrodiagnostic studies of her hands on February 9, 2016. Tr. at 499–501. She reported the fingers on her right hand went "to sleep during the night" and that she woke with her right hand feeling as if it were asleep. Tr. at 495. She endorsed some difficulty holding cups and opening jars. *Id.* She complained of neck and back pain and described her neck pain as constant and achy on most days. *Id.* Jacqueline F. Van Dam, M.D. ("Dr. Van Dam"), indicated a nerve study showed moderate right carpal tunnel syndrome ("CTS"), mild left CTS, and no evidence of ulnar neuropathy or cervical radiculopathy of either upper limb. *Id.*

On February 22, 2016, Plaintiff complained of a lot of neck and low back pain and requested a neurosurgical consultation. Tr. at 494. Dr. Loging

noted tenderness in Plaintiff's back, legs, and neck and referred her for a neurosurgical evaluation. *Id.*

Plaintiff followed up with Dr. Brown for medication refills on March 2, 2016. Tr. at 515. She reported nerve studies had shown bilateral CTS and she was scheduled to follow up with a neurologist. *Id.* Dr. Brown refilled Plaintiff's medications. *Id.*

On April 4, 2016, Plaintiff reported she had recently been crying a lot over nothing. Tr. at 514. She denied suicidal ideation, but said she had been overly emotional. *Id.* Dr. Brown assessed depression, prescribed Lexapro, and refilled Plaintiff's other medications. *Id.*

On May 3, 2016, Plaintiff complained of pain and swelling in her right great toe. Tr. at 513. She said a lead pipe had fallen on it two weeks prior, but x-rays were negative. *Id.* Dr. Brown refilled Plaintiff's medications. *Id.*

On May 12, 2016, an MRI of Plaintiff's lumbar spine showed multilevel spinal stenosis that had not changed significantly since March 27, 2015. Tr. at 542. At the L1–2 level, it indicated moderate canal stenosis secondary to posterior vertebral protrusion from the compression fracture and severe bilateral foraminal stenosis. *Id.* At the L4–5 level, it showed severe DDD with a disc that produced mild-to-moderate canal stenosis and moderate bilateral foraminal stenosis, as well as eccentric bulging of the disc to the right that produced severe right lateral recess stenosis. At L5–S1, it indicated moderate

degenerative disc space narrowing with a broad-based disc bulging that produced moderate canal stenosis, moderate right-sided lateral recess stenosis, severe left-sided lateral recess stenosis, and severe bilateral foraminal stenosis. *Id.*

Plaintiff reported doing well and requested medication refills on June 1, 2016. Tr. at 511. Dr. Brown refilled her medications. *Id.*

On June 29, 2016, Plaintiff informed Dr. Brown that she was scheduled to undergo right carpal tunnel surgery, but did not know when she would have surgery on the left. Tr. at 512. She complained of swelling and numbness in her hands each morning that was pronounced in her right index finger. *Id.* She reported she could not sleep for longer than four or five hours without being awakened by pain and could not sit or stand for long. *Id.* She endorsed depression due to worrying about her mother's health and requested she be referred to a psychiatrist. *Id.* She indicated she had moved her mother into her home two weeks prior. *Id.* Dr. Brown prescribed Zoloft 50 mg for depression and refilled Plaintiff's other medications. *Id.*

Dr. Loging performed right carpal tunnel release surgery on July 20, 2016. Tr. at 547–48. He discharged Plaintiff the same day and instructed her to take pain medication as needed and to follow up in two weeks. *Id.*

Plaintiff reported doing well, aside from a sinus problem, on July 27, 2016. Tr. at 510. She indicated Zoloft had made a tremendous difference. *Id.* Dr. Brown refilled Plaintiff's medications. *Id.*

Plaintiff reported doing fairly well on August 15, 2016. Tr. at 530. Dr. Loging indicated Plaintiff's surgical incision looked good. *Id.* He noted Plaintiff was already beginning to notice improvement in her right hand, and he hoped she would show more improvement over time. *Id.* He noted Plaintiff would ultimately require left carpal tunnel release and should contact him when she was ready to proceed. *Id.*

On January 17, 2017, Dr. Brown observed Plaintiff's neck to be tender to palpation. Tr. at 558. He noted pain with forward flexion of the spine and SLR without lower extremity radiculopathy and normal gait and station. *Id.* He refilled Plaintiff's medications. *Id.*

Plaintiff presented to Dr. Brown on February 15, 2017, with complaints of upper respiratory symptoms. Tr. at 560. Dr. Brown prescribed Zyrtec and Azithromycin and refilled Plaintiff's other medications. Tr. at 561. He suggested switching Plaintiff from Zoloft to Pristiq at her next visit. *Id.*

Plaintiff continued to complain of upper respiratory symptoms on March 15, 2017. Tr. at 563. She thought she was retaining fluid and requested her medication be adjusted. *Id.* Dr. Brown assessed acute

bronchitis and acute upper respiratory infection, in addition to Plaintiff's chronic diagnoses. Tr. at 563.

Plaintiff reported doing well and requested medication refills on April 11, 2017. Tr. at 566. Dr. Brown noted no abnormal findings and continued Plaintiff's medications. Tr. at 566–67.

On May 10, 2017, Plaintiff complained of sinus congestion after working in her yard and spraying weed killer. Tr. at 568. Dr. Brown noted no abnormal findings and continued Plaintiff's medications. Tr. at 568–69.

On June 15, 2017, Plaintiff complained that her lower back pain remained a 10 on a 10-point scale after taking pain medication. Tr. at 570. She rated her current pain level as a five. *Id.* She reported pain in the lateral side of her left ankle and indicated it gave out when she walked. *Id.* However, Dr. Brown noted x-rays had shown no damage. *Id.* Plaintiff complained of constant daily anxiety that moderately limited her activities. *Id.* She indicated she had visited a doctor as required by her insurance company and did not intend to return, as he had changed her medications to Morphine and Klonopin. *Id.* Dr. Brown noted Plaintiff's pain had been well-controlled on Norco 5/325 mg three times a day. *Id.* He observed decreased flexion, but full lateral bending and rotation of the spine and normal gait and station. Tr. at 571. He noted Plaintiff left the prescriptions she received for Morphine and Klonopin because she refused to take them. Tr. at 572. Dr. Brown prescribed

Norco 5/325 mg three times a day, Valium 10 mg twice a day, and Naproxen 500 mg twice a day and instructed Plaintiff to elevate her foot as much as possible and to wear a supportive shoe or brace. *Id.*

On August 10, 2017, Plaintiff reported doing well, aside from a persistent dry cough and possible urinary tract infection. Tr. at 573. Dr. Brown noted no abnormal findings on physical exam. Tr. at 573–74.

On September 6, 2017, Plaintiff reported her medication was controlling her back pain. Tr. at 576. She complained of stiffness in her right hand after recently using it to lift. *Id.* She also indicated she had injured the hand in an incident with her dog. *Id.* She said Vyvanse helped with her concentration. *Id.* Dr. Brown noted tenderness to Plaintiff's lumbar spine, but the physical exam was otherwise normal. Tr. at 576–77. He refilled Plaintiff's medications. Tr. at 577.

Plaintiff reported doing well on her medications on October 4, 2017. Tr. at 579. She complained of stiffness in the third finger of her right hand. *Id.* Dr. Brown indicated normal findings on physical exam. Tr. at 579–80.

On November 2, 2017, Plaintiff rated her pain as a three on a typical day with use of pain medication. Tr. at 581. However, she described her pain as a 10 without medication. *Id.* She requested refills of medications for back and neck pain, attention deficit hyperactivity disorder ("ADHD"), and anxiety. *Id.* Dr. Brown noted normal findings on physical exam. Tr. at 581–

82. He prescribed Voltaren 75 mg, twice a day and continued Plaintiff's other medications. Tr. at 582.

Plaintiff reported increased pain on November 30, 2017. Tr. at 583. She rated her pain as a five to six over the prior two weeks and described increased discomfort and stiffness. *Id.* Dr. Brown noted tenderness to Plaintiff's cervical spine. Tr. at 584.

Plaintiff rated her pain as a five with medication and a 10 without it on December 22, 2017. Tr. at 586. She complained that her muscle relaxer was ineffective and her pain medicine was not helping her neck pain. Tr. at 588. She reported being under a lot of stress. *Id.* She said Vyvanse improved her concentration and Valium helped her anxiety. *Id.* Kelley Miller, APRN, changed Plaintiff's pain medication to Percocet 5/325 mg twice a day and increased Valium from once to twice a day. *Id.* She referred Plaintiff to an ear, nose, and throat specialist for ear pain, tinnitus, and possible lymph node enlargement in the right posterior cervical region. *Id.*

### C.    The Administrative Proceedings

#### 1.    The Administrative Hearing

##### a.    Plaintiff's Testimony

At the hearing on May 11, 2018, Plaintiff testified she worked as a caregiver at Generations of Batesburg in 2012 and 2013. Tr. at 46, 49. She said she served as an overnight caregiver for two elderly clients from 2011 to

2014. Tr. at 47–48. She indicated she worked a seasonal job as a picker for Amazon. Tr. at 51. She stated she worked as an inspector for True Cast in 2011. Tr. at 52–53. Prior to that, she said she worked as a receiving clerk for Urban Outfitters. Tr. at 54. She indicated she had previously worked for Vanity Fair in the same location, where she entered data in the shipping department. Tr. at 55.

Plaintiff testified she lived in a doublewide mobile home with her mother. Tr. at 58. She stated she had moved her mother in with her in 2016 when her mother's health started to decline. *Id.* She indicated her mother required help in preparing meals, being reminded to take her medications, bathing, and dressing. Tr. at 58–59. She said her mobile home was located on 15 or 16 acres of land that she co-owned with her two brothers. Tr. at 59. She indicated her brothers helped her to cut the grass. Tr. at 59–60. She said she had a riding lawn mower, but her back pain was exacerbated by riding over bumps, her hands became numb, and exposure to the sun increased her blood pressure when she attempted to use the mower to cut her grass. Tr. at 60. She noted she had driven an hour to the hearing. Tr. at 60–61.

Plaintiff testified she had DDD in her back and neck that had worsened since her car accident. Tr. at 63. She admitted she took medication for back and neck pain. *Id.* She said Dr. Loging had administered injections that initially helped, but quit working. *Id.* She explained that Dr. Loging had

referred her to a neurologist who referred her for a computed tomography ("CT") scan, but she did not follow up because her insurance would not cover the CT scan. Tr. at 64. She said Dr. Brown was managing her pain as her primary care doctor. *Id.* Plaintiff described pain in her middle-left lower back that radiated to the front and traveled a little down her left leg. Tr. at 65. She admitted her medication effectively controlled some of her pain, but said she continued to have a nagging pain even with medication. Tr. at 65–66. She indicated she had to alternate sitting, standing, and walking. Tr. at 66. She said she would sometimes lie down for 10 to 15 minutes once or twice a day to address her pain. *Id.* She indicated it also helped her to lean over things to take pressure off her back. Tr. at 67. She said she would lean over the cart while shopping for groceries. *Id.* She stated she could sit for 15 minutes or maybe a little longer before she had to stand. *Id.*

Plaintiff testified her neck hurt all the time. Tr. at 68. She said she performed physical therapy exercises for her neck each morning that helped her to function. *Id.*

Plaintiff stated her medications caused her to feel anxious and sleepy, her hands to swell, and occasional nausea. Tr. at 69. She said they made her feel confused and caused difficulty concentrating at times. *Id.* She indicated she had some difficulty following directions. Tr. at 70.

Plaintiff said surgery to treat CTS in her right hand was ineffective because she continued to wake with swollen hands and was unable to make a fist. Tr. at 72. She stated she often dropped things without noticing they were slipping from her hands. *Id.* She said she could pick up small objects and engage in fine manipulation, but could not do so for long periods. Tr. at 73. She acknowledged having performed data entry work in the past and said she could do that work for a little while, but "would have to get up" because she "couldn't sit to do it" and her hands would cramp and swell up. *Id.* She admitted she wrote out her bills over 15 to 20 minutes without her hands "killing [her]," but denied being able to use her hands for two-hour periods. Tr. at 74. She said she had not undergone left carpal tunnel release because surgery had been ineffective on the right. Tr. at 80. She indicated she had not returned to Dr. Loging since August 2016. Tr. at 81.

Plaintiff testified she had taken in her daughter's pit bull when her daughter had a child. Tr. at 72. She said her daughter assisted her by continuing to wash the dog because she was unable to do so. *Id.*

Plaintiff admitted she had used a computer in prior jobs, but said she had received no training as to basic computer skills. Tr. at 75. She stated her prior employers had trained her how to use their specific programs. *Tr.* at 75–76.

Plaintiff testified she could no longer perform work as a sitter because most jobs as a caregiver required lifting. Tr. at 77. The ALJ reminded Plaintiff that she had testified to performing past jobs that did not require lifting. *Id.* Plaintiff stated she had to lift patients in her prior jobs if they fell, but admitted that did not happen frequently. Tr. at 78.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Cheryl Richardson reviewed the record and testified at the hearing. Tr. at 82–95. The VE categorized Plaintiff's PRW as a data entry clerk, *Dictionary of Occupational Titles* ("*DOT*") number 239.567-010, as requiring light exertion with a specific vocational preparation ("SVP") of two; a warehouse worker, *DOT* number 922.687-058, as requiring medium exertion with an SVP of two; a companion, *DOT* number 309.677-010, as requiring light exertion with an SVP of three; and a receiving clerk, *DOT* number 222.387-050, as requiring medium exertion with an SVP of five. Tr. at 83–84. She further clarified that Plaintiff had testified to having performed the job as a receiving clerk at the light exertional level and as a companion at the sedentary exertional level. Tr. at 84. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level over the course of an eight-hour workday in two-hour increments with normal and acceptable work breaks; could occasionally crawl and climb ladders, ropes, and scaffolds; could occasionally

stoop and lift within the exertional level from floor to waist; could frequently stoop and lift within the exertional level from waist-height and above; could frequently climb ramps and stairs, balance, and kneel; could frequently perform bilateral handling, fingering, and feeling within the exertional level; could occasionally be exposed to hazards associated with unprotected dangerous machinery or unprotected heights; and could accommodate any need to sit, stand, or walk around the work station through normal breaks. Tr. at 85–86. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a data entry clerk and a companion both as described by the *DOT* and as performed by Plaintiff. Tr. at 86. The ALJ asked whether Plaintiff had any transferable skills from PRW. Tr. at 87. The VE testified that the job as a receiving clerk produced transferable skills as to abilities to verify and maintain records, communicate, and exercise judgment and decision-making skills. *Id.* She stated Plaintiff's transferable skills could be used to perform jobs as an order caller, *DOT* number 209.667-014, requiring light exertion with an SVP of two, and having 11,000 position in the national economy; a service order expediter, *DOT* number 222.367-010, requiring light exertion with an SVP of three, and having 4,000 positions in the national economy; and an industrial order clerk, *DOT* number 222.367-022, requiring sedentary exertion with an SVP of four, and having 20,000 position in the national economy. Tr. at 87–88. The ALJ asked the kind of vocational

adjustment that would be required for the job of industrial order clerk. Tr. at 88. The VE stated there would be no major vocational adjustment. *Id.*

For a second hypothetical, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited to work at the sedentary exertional level with the additional restrictions set forth in the first question. *Id.* He asked if the individual could perform any of Plaintiff's PRW. Tr. at 89. The VE testified the individual could perform Plaintiff's PRW as a companion as she performed it. *Id.* She also stated Plaintiff could perform work as an industrial order clerk with very little vocational adjustment. *Id.*

For a third hypothetical, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first hypothetical and could concentrate, persist, and maintain pace sufficient to understand, remember, and carry out unskilled, routine tasks in a low stress work environment, defined as being free of fast pace or team-dependent requirements and involving the application of common sense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Tr. at 90. He further described the individual as being able to deal with problems involving several concrete variables in or from standardized situations and being able to adapt to occasional workplace changes. *Id.* He confirmed the individual would have no transferable skills

from PRW because she would be limited to unskilled work. Tr. at 90–91. He asked if the individual could perform Plaintiff's PRW. Tr. at 91. The VE testified the individual could perform Plaintiff's PRW as a data entry clerk. *Id.*

Finally, the ALJ asked the VE to consider the restrictions set forth in the prior hypothetical questions, but to further assume the individual would be able to maintain concentration, persistence, or pace for only 75% of the workday and would be absent from work an average of three or more days per month. Tr. at 91–92. The VE stated the individual would be able to perform no work. Tr. at 92.

Plaintiff's attorney asked the VE to consider whether an individual would be able to perform Plaintiff's PRW if she were limited to occasional bilateral handling, fingering, and feeling. Tr. at 94. The VE testified that Plaintiff's PRW would be precluded and the individual would be unable to perform jobs involving transferable skills from her PRW. Tr. at 94–95.

### 2.    The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2018 (Exhibit 6D/1).
2.    The claimant has not engaged in substantial gainful activity since May 16, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: lumbar degenerative disc disease and L1 compression fracture, cervicalgia, right carpal tunnel syndrome status post surgery on July 20, 2016, left carpal tunnel syndrome, and hypertension (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that over the course of an 8-hour workday, in 2-hour increments with normal and acceptable work breaks, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can occasionally climb ladders, ropes or scaffolds and crawl. Can occasionally stoop to lift within the exertional level from the floor to the waist. Can frequently stoop to lift within the exertional level from waist height and above. Can frequently climb ramps and stairs, balance and kneel. Bilateral handling, fingering and feeling can be performed frequently within the exertional level. Can occasionally be exposed to hazards associated with unprotected dangerous machinery or unprotected heights. Normal work breaks can accommodate any other need to sit stand or walk away from the workstation.

6.    The claimant is capable of performing past relevant work as a Data Entry Clerk and Companion. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from May 16, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at  21–32.

II.    Discussion

Plaintiff alleges the Commissioner erred in evaluating her treating physicians' opinions. The Commissioner counters that substantial evidence

supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

At Plaintiff's first visit on April 27, 2015, Dr. Loging stated she should not engage in strenuous activities or lift over 20 pounds, but could perform office work. Tr. at 471.

On June 29, 2016, Dr. Brown completed several questionnaires as to Plaintiff's impairments and limitations. Tr. at 503–09. He stated Plaintiff's diagnoses were lumbago and right-greater-than-left CTS. Tr. at 503. He indicated he had been treating Plaintiff since April 2014. *Id.* He noted Plaintiff was scheduled for carpal tunnel surgery on July 20, 2016, and a neurosurgical consultation on August 2, 2016. *Id.* He stated Plaintiff's prognosis was good. *Id.* He identified pain in Plaintiff's lumbar spine and bilateral wrists and radiculopathy in her left lower extremity. *Id.* He felt that Plaintiff's pain and medications affected her ability to concentrate on and carry out simple, one- to two-step instructions for two to three hours per day. Tr. at 504. He indicated Plaintiff's lower back pain caused easy fatigue requiring rest periods of 20 minutes per hour. *Id.* He stated Plaintiff experienced pain, stiffness, and numbness due to a compression fracture at L1 and bilateral CTS that necessitated she lie down for 30 minutes every two hours. Tr. at 505. He noted Plaintiff had bad days that occurred four to five times per week. *Id.* He indicated Plaintiff would likely miss more than three days of work per month because of her medical conditions. *Id.* He stated her

condition had lasted for 12 months or was expected to last for 12 months at the level he described. Tr. at 506.

Dr. Brown estimated Plaintiff could occasionally lift 10 pounds, frequently lift less than five pounds, stand and/or walk for at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Tr. at 507. He noted Plaintiff's abilities to push and pull would be limited in her upper extremities due to bilateral CTS that affected her ability to grasp. *Id.* He stated grasping increased the severity of Plaintiff's symptoms. Tr. at 508. He indicated Plaintiff's ability to grasp and hold medium to large objects was affected by bilateral CTS such that she could engage in this activity for four hours in an eight-hour day. *Id.* He felt that bilateral CTS affected Plaintiff's ability to engage in fine manual dexterity such that she could hold and handle small objects for one hour, finger and feel objects for one hour, and write, type, and complete forms for less than one hour per day. *Id.*

Dr. Brown specified that Plaintiff's prescribed medications of Norco, Valium, and Naproxen caused side effects that included fatigue, drowsiness, nausea, and edema. Tr. at 509. He felt that side effects of Plaintiff's medications affected her ability to concentrate such that she could not concentrate on and carry out simple, one- to two-step instructions or persist in an assigned task on a continuous basis for six hours over an eight-hour

period with 15-minute breaks every two hours and a half-hour break after four hours. *Id.*

On September 11, 2016, Dr. Loging also completed several questionnaires addressing Plaintiff's impairments and limitations. Tr. at 549–55. He identified Plaintiff's diagnoses as multilevel DDD and CTS. Tr. at 549. He stated he had first treated Plaintiff in April 2015 and had provided injections and surgery for CTS. *Id.* He explained that Plaintiff's impairments would progressively worsen. *Id.* He stated Plaintiff experienced pain in her back, arms, and legs that affected her ability to concentrate on and carry out simple, one- to two-step instructions at times. Tr. at 549–50. He stated Plaintiff's DDD caused easy fatigue and required rest for 10 to 15 minutes every two to three hours. Tr. at 550. He noted Plaintiff's pain related to DDD would require she lie down for 10 to 15 minutes once or twice a day. Tr. at 551. He admitted Plaintiff's impairments likely resulted in good and bad days, but was unable to determine how frequently she would have bad days. *Id.* He indicated Plaintiff's impairment was severe enough to cause her to miss work an average of more than three times a month. *Id.* He stated her condition had lasted for 12 months or was expected to continue for 12 months at the severity he described. Tr. at 552. Dr. Loging estimated Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk for at least two hours in an eight-hour workday, and six for less than six

hours in an eight-hour workday. Tr. at 553. He stated Plaintiff had limited ability to push and pull with her lower extremities. *Id.* He noted his conclusions were supported by MRIs and physical exams. *Id.* He stated Plaintiff's CTS affected her ability to use her hands. Tr. at 554. He indicated her ability to use her hands to engage actions requiring gross manual dexterity was progressively worse with use. *Id.* He noted it would be difficult for Plaintiff to engage actions requiring fine manual dexterity to include grasping, holding, and handling small objects, fingering and feeling, and writing, typing, and completing forms because of numbness. *Id.* He said the legibility of Plaintiff's writing would decrease, but she could engage in writing. *Id.* He denied having prescribed Plaintiff's medications. Tr. at 555.

Plaintiff argues the ALJ failed to evaluate her treating physicians' opinions in accordance with 20 C.F.R. § 404.1527 and § 416.927. [ECF No. 14 at 9]. She maintains treatment notes from Drs. Loging and Brown support their opinions. *Id.* at 10–11. She also contends their opinions are supported by the objective evidence and are consistent with each other. *Id.* at 10–11, 12. She claims the ALJ erred in stating neither physician was a specialist given Dr. Loging's orthopedic surgery specialization. *Id.* at 12. She asserts her treating physicians' opinions do not support an RFC for light or sedentary work and refute the notion that she could perform her PRW. *Id.* at 13.

The Commissioner argues the ALJ properly weighed the medical opinions. [ECF No. 18 at 12]. He maintains the ALJ accorded some weight to the treating physicians' opinions based on the treating relationships, but generally found they lacked the support of significant clinical and laboratory abnormalities. *Id.* at 13. He contends the evidence supported the RFC for light work the ALJ assessed and was inconsistent with the additional restrictions Drs. Loging and Brown provided. *Id.* at 13–15. He admits the ALJ erred in failing to consider Dr. Loging's orthopedic specialization, but claims the error is inconsequential, as the record does not support the disabling limitations he indicated. *Id.* at 15.

If a treating physician's medical opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record, the applicable regulations direct that the ALJ accord it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[3] "[T]reating physicians are given 'more weight . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical

---

[3] Because Plaintiff filed her claim prior to March 27, 2017, the court considers the ALJ's evaluation of medical opinions based on the rules in 20 C.F.R. § 404.1527 and § 416.927 and SSRs 96-2p, 96-5p, and 06-03p. *See* 20 C.F.R. §§ 404.1520c, 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [§ 416.927] apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSRs 96-2p, 96-5p, and 06-03p were effective for "claims filed on or after March 27, 2017").

impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone[.]'" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). However, unless the ALJ issues a fully favorable decision, his decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and must be "sufficiently specific to make clear" to the court "the weight [he] gave to the . . opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, *5 (1996).

A finding that a treating physician's opinion is not entitled to controlling weight does not mean it should be rejected. SSR 96-2p, 1996 WL 374188, at *4. The ALJ must assess every medical opinion of record in view of the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record,

and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)).

"[A]bsent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion," *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam), the court should not disturb the ALJ's weighing of the medical opinions of record.

The ALJ gave partial weight to Dr. Loging's April 27, 2015 opinion, explaining:

> [T]he undersigned notes that the opinion was stated at the inception of treatment, and there is a concern that the opinion was rendered for the benefit of Vocational Rehabilitation purposes. As detailed above, treatment notes from Dr. Loging indicate that the epidural steroid injections were beneficial, improving the claimant's symptoms. The claimant appears to have last sought treatment from Dr. Loging in August 2016. What is more, the limitation to "office-type work" is given lesser weight, as the ability to perform specific jobs is an issue reserved solely to the Commissioner.

Tr. at 29.

He addressed Dr. Loging's September 11, 2016 opinion and Dr. Brown's June 29, 2016 opinion as follows:

> Some weight is given to the medical opinion of Dr. Loging and Dr. Brown in Exhibits 10F and 13F, as the doctors have had a treating relationship with the claimant over a period of time and are able to provide a general longitudinal picture of the claimant's medical impairments. However, the opinions were

provided in 2016, and there is a concern that the doctors relied too heavily on the claimant's subjective report symptoms and limitations, uncritically accepting as true most, if not all, of what the claimant reported. However, as detailed above, the treatment notes from Palmetto Bone and Joint and Martinez Urgent Care do not contain the type of significant clinical and laboratory abnormalities one would expect if the claimant was as limited as alleged by Dr. Loging and Dr. Brown. Notably, neither physician is an orthopedic or neurosurgical specialist. The opinions were provided on a representative-drafted checkbox form with questions not always consistent with Social Security regulations and definitions regarding disability. Many of the questions on the form are gratuitously asked and answered that have little bearing on the claimant's specific impairments, or are not supported in the diagnostic and examination findings. As an example, the need to "lay in a prone position" is not supported by the record, including physical examinations and/or radiological findings. Additionally, the physicians were asked to comment on speculative limitations, such as time off task, rest breaks, absenteeism, and a sit/stand option. It is concerning that the doctors' own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were as limited as alleged, and the doctors did not specifically address this weakness. As noted above, treatment notes from Martinez Urgent Care state, "[Patient] pain has been well controlled with norco 5 TID" (Exhibit 14F/15). Treatment notes from Palmetto Bone and Joint state, "M[s]. Schumpert is here for follow-up today of bilateral carpal tunnel syndrome, status post right carpal tunnel release. She is doing fairly well" (Exhibit 12F/1). The undersigned finds that the longitudinal treatment reports, including objective examination findings, is more informative and persuasive than the opinion evidence in Exhibit 10F and 13F.

Tr. at 30.

The court finds the ALJ's evaluation of the treating physicians' opinions to be unsupported by substantial evidence for several reasons. First, the ALJ gave reduced weight to Drs. Brown and Loging's opinions as

unsupported by the treatment notes and inconsistent with the examination findings, but failed to reconcile the consistency between their two opinions. Although Drs. Brown and Loging did not indicate Plaintiff's impairments would impose all of the exact same limitations, they provided similar lifting, standing, walking, and sitting restrictions; noted her pain would impair her concentration such that she would unable to concentrate on or carry out simple, one- to two-step instructions at times; felt she would miss work an average of more than three times a month; and considered Plaintiff incapable of engaging in gross and fine manual dexterity over prolonged periods. *Compare* Tr. at 503–09, *with* Tr. at 549–55. Drs. Brown and Loging's opinions were consistent with an RFC that would not allow for work. *See* Tr. at 91–92 (reflecting the VE's opinion that no work would be available for an individual who could maintain concentration for only 75% of the workday and would be absent from work more than three times per month), 94–95 (providing the VE's opinion that Plaintiff's PRW would be precluded for an individual limited to occasional bilateral handling, fingering, and feeling). The ALJ did not reconcile his finding that Drs. Brown and Loging's opinions were inconsistent with the record with the fact that Plaintiff's only two treating physicians offered many of the same work-preclusive restrictions.

Second, the ALJ cherrypicked the record and ignored significant objective evidence and complaints in deeming Drs. Brown and Loging's

opinions unsupported by their findings and inconsistent with the record. In referencing the MRI of the lumbar spine from May 2016, the ALJ indicated it "showed multilevel spinal stenosis, not significantly changed from 2015 (Exhibit 12F/13)," but did not discuss the more detailed findings on either the 2015 or 2016 MRI reports. *See* Tr. at 27. He referenced the electrodiagnostic studies of Plaintiff's hands and her carpal tunnel release on the right, but essentially concluded restrictions as to Plaintiff's use of her hands were contraindicated based on the singular follow up visit during which Dr. Loging removed her stitches, but indicated she would still require surgery on her left hand. *See id.* (referencing Tr. at 530). Elsewhere in the decision, he wrote "[t]here ha[d] been no surgical recommendations," Tr. at 28, despite Dr. Loging's indication Plaintiff would require left carpal tunnel release surgery. The ALJ concluded ESIs "were beneficial, improving the claimant's symptoms," Tr. at 29, despite her reports that they became less effective over time. *See* Tr. at 467, 485. Thus, the ALJ impermissibly ignored or failed to resolve relevant evidence that supported the treating physicians' opinions while citing evidence that reinforced his conclusion that the opinions were unsupported by and inconsistent with the record. *See Lewis*, 858 F.3d at 869 ("'An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while

ignoring evidence that points to a disability finding.'") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

Third, the ALJ erroneously claimed neither physician was an orthopedic or neurological specialist, but the record reflects and the Commissioner concedes Dr. Loging's specialization as an orthopedic surgeon. Elsewhere in the decision, the ALJ indicated he discounted Plaintiff's subjective allegations because "[s]he ha[d] not received treatment from an orthopedic or neurological specialist." Tr. at 28. The regulations direct ALJs to "give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). Dr. Loging was not only an orthopedic surgeon, but the orthopedic surgeon who treated Plaintiff's multiple spinal impairments and CTS and performed her right carpal tunnel release surgery. Pursuant to the regulations, the ALJ should have credited more weight to Dr. Loging's opinion.

Given the foregoing errors in evaluating Plaintiff's treating physicians' opinions, the undersigned finds substantial evidence does not support his evaluation of the evidence in reaching his decision.

III.  Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of

fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

August 3, 2020
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge